UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

---

MICHAEL BENEDICT,

    Plaintiff,

    v.                                                      Case No. 13-C-0512

CAROLYN W. COLVIN
Acting Commissioner of Social Security,

    Defendant.

---

## DECISION AND ORDER REVERSING AND REMANDING
## THE DECISION OF THE COMMISSIONER

Plaintiff, Michael R. Benedict, seeks review of the final decision of the Commissioner of the Social Security Administration denying his claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. Benedict's application alleged that he was disabled since birth (December 17, 1990.) (Tr. 170.) The application was denied administratively, and following a hearing. On February 24, 2012, the ALJ concluded that Benedict has the residual functional capacity to perform a full range of work at all exertional levels with some limitations. (Tr. 24, 91.) The Appeals Council denied Benedict's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3.) For the reasons set forth below, the decision of the Commissioner is reversed and the case remanded for further proceedings pursuant to 42 U.S.C. § 405(g), sentence four.

## FACTS

Benedict asserted that he could not work because of a bipolar disorder, oppositional defiant disorder (ODD), and attention deficit hyperactivity disorder (ADHD). His mother, Lynette Held, testified that he had a lot of problems "early on" with ear infections, high

fevers, and uncontrollable screaming. (Tr. 88.) By age two, Held had taken Benedict to a psychiatrist because she was unable to control him. She tried medications, but Benedict was removed from numerous day cares and preschools because he could not get along with other children. (Tr. 89.)

The record contains a summary of the Burlington and Lake Geneva School District's Individualized Education Programs (IEPs) for grades 1-11 and the City of Lake Geneva Police Department Truancy Citations for grades 8-11. (Tr. 192-207.) In the first grade, Benedict was diagnosed with ADHD and the school noted that Ritalin had been discontinued after a short period because of negative side effects. (Tr. 192.) Doctors then prescribed Clonidine three times per day, and Imipramine at bedtime to help settle Benedict down to sleep. (Tr. 192.) Benedict was found to be functioning within the low average range – at a kindergarten level – with significant off-task behaviors. (*Id.*) Teachers observed him hitting, pushing, and shoving classmates, and noted his temper. (*Id.*)

By the time Benedict was in second grade, he had been moved to a half-day program at St. John's Lutheran School, where he had a smaller group with another teacher. However, even with these modifications, Benedict displayed significant behavioral concerns and was functioning below the average of other students in the classroom. (Tr. 194.) He was defiant, disruptive, and refused to do the work. (*Id.*)

Teachers in the third grade rejected the possibility of full-time participation with non-disabled peers because of Benedict's attention-seeking behaviors, oppositional-defiant behaviors, and language arts concerns. (Tr. 194.) Similarly, in fourth grade, he could not be in the full-time curriculum, and continued to seek negative attention from his peers

2

leading to "inappropriate and sometimes bizarre behavior." (Tr. 195.) Benedict was two years below grade level in reading and had to take the Wisconsin Knowledge and Concepts Examination (WKCE) in a small group setting with the questions read to him. (*Id.*) His frustration levels, disobedience, and defiance negatively impacted his ability to learn. (*Id.*)

Benedict's three year re-evaluation occurred on May 23, 2001. (Tr. 195.) The report noted that he had been on medication for ADHD, depression and bi-polar disorder. (Tr. 196.) Benedict continued with half-day programming and was functioning in the low average range of overall ability but below grade level. (Tr. 196.) He displayed inappropriate behaviors, including non-compliance, difficultly working independently, became easily agitated and refused to do work. Benedict's behavior impeded his learning significantly and the learning of other students. (Tr. 197.) Additionally, his low frustration level, stubbornness, and refusal to cooperate prevented him from being in a classroom of his peers. (*Id.*)

The sixth grade IEP team modified assignments, administered tests in the special education classroom, and shortened Benedict's school day to end at 1 p.m. (Tr. 198.) At times Benedict would refuse to speak to anyone, was oppositionally defiant and was uncooperative. (*Id.*) Seventh and eighth grade notes found that Benedict's disability did not allow for success in general curriculum. (Tr. 200-203.)

By high school, Benedict began having problems with truancy and received a citation for disorderly conduct after he was caught smoking marijuana over the lunch hour. (Tr. 206.) He reported migraines, and was sensitive to light, sounds and food. (*Id.*) In addition, Benedict was being treated for ADHD and bi-polar syndrome. By January 3, 2008,

3

Benedict had 34 absences, and by May he was not permitted on school grounds during the day. (Tr. 207.) Moreover, he received four citations between October 10, 2007, and May 7, 2008, for daily truancy. (Tr. 206-207.)

Medical records from Milcom date back to 1994. A January 23, 1997, entry indicates that the school wanted Benedict to be seen by a psychiatrist. (Tr. 739.) A note from March of 1997 corroborates his mother's testimony that Benedict purposefully burned his hand on the stove. (*Id.*) Between 2004 to 2006, Benedict was seen by Cornerstone Counseling Service and was prescribed Aderall, Risperdal and Wellbutrin. (Tr. 713.) One entry indicates that Benedict volunteered little information, maintained poor eye contact, and minimized problems with mood and behaviors while his mother was reporting major issues with defiance, instability, and impulsive behavior. (Tr. 712.)

Benedict was admitted to the Aurora Psychiatric Hospital on November 6, 2007, for evaluation and observation after making suicidal threats. The admitting diagnosis was ADHD, possible mood disorder and rule out depression. His admission GAF was 35 to 40. (Tr. 747.) Initially, Benedict was resistant and uncooperative, but later he began to participate in all aspects of his programming. Hospital staff concluded that Benedict had significant issues with irritability, anger, and impulsivity over and above the ADHD symptoms, and added the medication Abilify to Benedict's treatment program. Additionally, the treating physician strongly recommended individual and family counseling and that Benedict be followed by a child/adolescent psychiatrist to monitor his clinical status and medications. (Tr. 748.)

One week after his discharge, Benedict was seen in the Behavioral Health Services at Aurora by Leonard Hedges-Goettl, M.Div., Psy. D. (Tr. 750.) Hedges-Goettl noted a

4

"long history of school discipline for disobedience, fighting, truancy, destroying property in anger, etc." *Id.* Charges of truancy, disorderly conduct, as well as breaking and entering are further noted regarding Benedict's involvement with the legal system. (*Id.*) His diagnoses were: bipolar I disorder, learning disorder NOS by history, ADHD, ODD, and problems with primary support group, social environment, educational problems, and interaction with the legal system/crime. Benedict's GAF was 50. (*Id.*)

Walworth County's corrections records for August 4, 2008, indicate that Benedict had not slept for six days. Benedict reported being on Abilify but had stopped seeing a doctor. (Tr. 642.) From May through August of 2009, Benedict was in AODA Adult Primary and Education Group therapy. (Tr. 654.) However, he was not committed to treatment, had multiple unexcused absences and was noncompliant. (*Id.*)

Finally, on July 2, 2010, Benedict sought medication management through Walworth County Health and Human Services. (Tr. 648.) He reported struggling to maintain focus since childhood, thereby leading to academic difficulties and poor relationships. Benedict described a history of impulsive behavior and poor frustration tolerance. (*Id.*)

Dr. Steven Ortell evaluated Benedict on September 7, 2010. (Tr. 652.) Benedict reported poor focusing and performance without his medication, and explained that he gets easily frustrated. In addition, Benedict reported two prior inpatient hospitalizations and stated that he drank beer and felt a little better when he smoked marijuana. (Tr. 652.) In the prior year Benedict's highest GAF was 40 to 45, and he had a physical altercation with his mother as noted in the social worker's report. (Tr. 652.) Dr. Ortell concluded that Benedict was a "somewhat immature adolescent who has been having significant

5

instability." In addition, he was concerned that Benedict could act impulsively or assault someone. (Tr. 653.)

During the January 30, 2012, hearing before the Administrative Law Judge, Benedict appeared with counsel and his mother. Vocational Expert Robert Neuman testified. (Tr. 41.) Benedict explained that he lived in a "cottage type cabin thing" next to his grandparent's home and that his grandparents paid the $250 monthly rent. His monthly income was $8 to $10 from cashing in aluminum cans. (Tr. 49.) Benedict did not have a driver's license, and reported that he was in special education his entire life. (Tr. 8-9.) He worked at Allied Plastics for a half an hour before walking out because he was frustrated and no one could help him. (Tr. 52.) In addition, he worked at Piggly Wiggly a week or two but was terminated after looking at the wrong schedule and calling in sick a day or two. (Tr. 53.) In June of 2009, Benedict worked at a hotel in Lake Geneva where his job was making sure that no one pulled into the parking lot. He became bored and walked away. (Tr. 55.)

Benedict testified that he has a problem getting along with certain people and cannot maintain his focus – even if it is something he is very interested in like building race cars. (Tr. 56.) At the time of his hearing, Benedict was taking Wellbutrin SX, Abilify and Vyvanse. (Tr. 57.) He reported that he had stopped taking his prescriptions for some period because his last psychiatrist went to prison; however, he was attempting to get the medications back to where they should be. (Tr. 59.) Benedict admitted to smoking cigarettes, drinking alcohol socially, but denied marijuana use and explained that he was arrested because someone put their pipe into his pocket. (Tr. 61.)

6

When questioned by the ALJ, Benedict testified that he gets a lot of reminders from his grandparents and parents and that he can cook small meals for himself. (Tr. 64.) Benedict also said he can clean for himself, and loves to fish and watch racing. (Tr. 66-68.) Counsel clarified through his examination, that Benedict was only able to complete the function report after a number of meetings with Sherry Stoffel at the Walworth County Health and Human Services. (Tr. 70, 77.) He completed a job application "a couple of summers ago," and his mother helps him fill out paperwork. (Tr. 72.) Benedict testified that he does not get along with family members and does not want to live by the rules. (Tr. 73.) He gets up around 11 or noon and goes to bed early morning due to sleep problems. (Tr. 77.) Benedict paces from room-to-room, and sometimes walks around Lake Como or from Lake Como to Lake Geneva. (Tr. 79.) Although he can do chores, it took him three weeks to replace a two-or-three foot section of carpet with tile and months to paint his cottage. (Tr. 80.) When asked about his problem paying attention, Benedict stated:

> Oh, it just seems difficult. Like I don't even notice it. I'll be doing something, and then all of a sudden somebody's like, "Whoa, hello, ADD." It's, like "What? What'd I do?" You know, somebody's just be like goofing around or something. You know, it's, like, "Dude, you were just like here, now all of a sudden you're all over the place." It's, "Oh." You know, a lot of times I don't even realize I'm all over the place.

(Tr. 81.)

Held testified that she worked in the medical field for 27 years and was currently employed as a supervisor in cardiology. (Tr. 88.) She said that Benedict had no fear. At age three, he jumped from the swing set, broke an ankle and did not cry or react to pain, but she did not realize it was broken until later that evening when they tried to take off his boot. (*Id.*) Two years later, Benedict put his hand on the stove to see what would happen

7

to his skin. (Tr. 90.) He doesn't like other people, he doesn't follow directions, and he does not like taking directions from authority. (*Id.*) Benedict's father tried to hire him in the tile business "over and over" but Benedict could not work a full day, focus, or stay on task. (*Id.*)

According to Held, Benedict will walk for hours, does not pay his own bills, cannot manage money, and needs reminders to take a shower. (T. 94.) She says it is a struggle to deal with him everyday and that someone has to care for him because he would otherwise be dead or in prison. (Tr. 95.) She reminds Benedict to eat, reminds him to make his food, and takes him shopping. (Tr. 96.)

The VE was asked a hypothetical involving a person who was limited to simple, routine, and repetitive tasks with only occasional interaction with the public and co-workers. (Tr. 104.) He responded by providing examples such as custodians, hand packers, machine operator, and dishwashers. (Tr. 105.) Frequent or occasional supervision would allow for jobs in the economy. (Tr. 107.) However, if that hypothetical person required constant supervision, there would be no jobs. (Tr. 106.)

The ALJ issued his decision on February 24, 2012, finding that Benedict had not engaged in substantial gainful activity since the application date of August 13, 2010, and that Benedict has the following severe, impairments: ADHD, bipolar disorder and a history of substance abuse. (Tr. 25.) Nevertheless, Benedict did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. In reaching that conclusion, the ALJ noted what he perceived to be a discrepancy between Held's testimony and a letter submitted by a woman who supervised Benedict for a month. The ALJ found moderate

8

difficulties with concentration, persistence, or pace, and placed "substantial weight" on the assessments of state disability psychological consultants Drs. Susan Donahoo and Ester Lefevere. (Tr. 28.) Moreover, the ALJ found that Benedict had the residual functional capacity to perform a full range of work at all exertional levels with nonexertional limitations of "simple, routine, and repetitive tasks with only occasional interaction with the public and co-workers." (Tr. 30.) As a result, the ALJ concluded that there were jobs in significant numbers in the national economy that Benedict could perform, and that he has not been under a disability since August 13, 2010, the date of the application. (Tr. 34-35.)

## DISCUSSION

The task of the reviewing court is not to redetermine disability but rather to ensure that the ALJ applied the correct legal standards and supported his decision with substantial evidence. *Bates v. Colvin*, 736 F.3d 1093, 1097 (7th Cir. 2013). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 1098 (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "This deferential standard of review is weighted in favor of upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision. Rather, the ALJ must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination." *Moon v. Colvin*, 2014 WL 3956762, at *2 (7th Cir. Aug.14, 2014) (citing *Moore v. Colvin*, 743 F.3d 1118, 1120-21 (7th Cir. 2014). Moreover, the Commissioner's lawyers may not fill in gaps in the ALJ's decision. *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002).

The most troubling aspect of the decision is the ALJ's evaluation of the opinions of the state agency psychologists in the context of the RFC determination and the

9

hypotheticals posed to the VE. The October 18, 2010, Psychiatric Review Technique Form completed by Dr. Susan Donahoo, Psy. D., found mild restrictions in daily living, moderate difficulties in maintaining social functioning and maintaining concentration, persistence or pace, and no episodes of decompensation of extended duration. (Tr. 667.) Similarly, Dr. Ester Lefevere, Ph.D., found identical limitations on March 18, 2011. (Tr. 701.) Each doctor found Benedict to be fully credible, and the ALJ gave substantial weight to the reports at step three and step four. (Tr. 689, 673.) Nevertheless, it appears that the ALJ did not consider the multiple moderate limitations found by the state agency physicians inasmuch as the RFC and corresponding hypothetical presented to the VE did not account for moderate limitations in concentration, persistence, or pace. While the ALJ may rely on the assessment of a medical source of record to formulate his RFC finding and hypothetical, *Johansen v. Barnhart*, 314 F.3d 283, 285-86 (7th Cir. 2002), Dr. Donahoo's report was internally inconsistent to the extent that section III found that Benedict retained the capacity to tolerate the basic mental demands of unskilled work notwithstanding the moderate limitations noted in section I.

Limiting a claimant to routine, repetitive tasks with simple instructions does not necessarily account for a moderate limitation in concentration, persistence, or pace, and the ability to do sustained work over a period of time. *O'ConnorSpinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010). The Seventh Circuit Court of Appeals has explained:

> In most cases, however, employing terms like "simple, repetitive tasks" on their own will not necessarily exclude from the VE's consideration those positions that present significant problems of concentration, persistence and pace. *Stewart*, 561 F.3d at 684–85 (limiting hypothetical to simple, routine tasks did not account for limitations of concentration, persistence and pace); *see also Craft v. Astrue*, 539 F.3d 668, 677–78 (7th Cir.2008) (restricting hypothetical to unskilled work did not consider difficulties with memory,

10

> concentration or mood swings); *Ramirez v. Barnhart*, 372 F.3d 546, 554 (3d Cir. 2004) (allowing VE to consider only one- or two-step tasks did not account for limitations of pace); *Kasarsky*, 335 F.3d at 544 (phrasing hypothetical question as involving an individual of borderline intelligence does not account for limitations of concentration). The ability to stick with a given task over a sustained period is not the same as the ability to learn how to do tasks of a given complexity. *Stewart*, 561 F.3d at 684–85; *Craft*, 539 F.3d at 677; *Kasarsky*, 335 F.3d at 544; *see also* SSR 85–15, 1985 WL 56857 (1985) ("Because response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job. A claimant's [mental] condition may make performance of an unskilled job as difficult as an objectively more demanding job.").

627 F.3d at 620. Therefore the language used by the ALJ in the RFC must reflect all of the claimant's limitations. In the case at bar, the ALJ's use of "simple, routine tasks" fails to assure this court that he considered Benedict's ability to stick with a given task over a long period of time.

The discrepancy between the ALJ's hypothetical, the RFC finding and the two state agency reports are more glaring when considering the extent of the moderate limitations found by each psychologist. Dr. Donahoo's report found that Benedict was moderately limited in his ability to: (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods; (4) perform activities within a schedule, maintain regular attendance, and be punctual with customary tolerances, sustain an ordinary routine without special supervision; (5) work in coordination with or proximity to others without being distracted by them; (6) make simple work-related decisions; (7) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length for rest period; (8) interact appropriately with the general public; (9) accept instructions and respond appropriately to criticism from the supervisors;

(10) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (11) maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; (12) respond appropriately to changes in the work setting; and (13) set realistic goals or make plans independently of others.  Likewise, Dr. Lefevre found moderate limitations in Benedict's ability to: (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods; (4) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (5) sustain an ordinary routine without special supervision; (6) complete a normal workday and workweek without interruption from psychologically based symptoms; (7) perform at a consistent pace without an unreasonable number and length of rest periods; (8) interact appropriately with the general public; (9) accept instructions and respond appropriately to criticism from supervisors; (10) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; (11) respond appropriately to changes in work setting; and (12) set realistic goals or make plans independently of others.  (Tr. 687-688.)

The Commissioner asserts that the ALJ acknowledged that Benedict had "complex" mental impairments and reasonably relied on the conclusions of the state agency psychologists on their respective forms.  Relatedly, Dr. Donahoo found that Benedict retained the basic mental capacity for unskilled work but "may have moderate difficulty with concentration, persistence, pace and social interaction in the workplace." (Tr. 673.)  The Commissioner further argues that the agency psychologists are experts in Social Security disability evaluation, 20 C.F.R. § 416.927(e)(2)(I) and it is "reasonable to conclude that Dr. Donahoo was aware of the criteria set forth in Social Security Ruling 85-15, which explains

12

that '[t]he basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers and usual work situations; and to deal with changes in a routine work setting." SSR 85-15.

Ultimately, the ALJ is required to build a logical bridge from the opinion evidence in the record to his own RFC determination. *See Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). Although the ALJ provided a narrative of the two expert reports and stated that he was giving them substantial weight, he did not present the moderate limitations given by the state agency psychologists to the VE. The ALJ must "orient the VE to the totality of a claimant's limitations." *O-Conner-Spinner*, 627 F.3d at 619. Here, the ALJ posed a series of increasingly restrictive hypotheticals to the VE involving "simple, routine, and repetitive tasks" and varying the amount of supervision required. (Tr. 103-107.) Although the VE was present for the hearing and reviewed Benedict's work history, it is not clear whether he had the opportunity to review the medical record or reports. To this end, the court infers that the VE's attention was focused on the hypotheticals and not the record. *O'Connor-Spinner,* 627 F.3d at 619. Consequently, it is not clear whether the VE properly identified the jobs that Benedict is able to perform or that the decision is supported by substantial evidence.

The court is similarly troubled by the evaluation of the intensity, persistence and limiting effects of Benedict's symptoms. The ALJ erred in evaluating Benedict's credibility and the limiting effects of his symptoms *after* evaluating the listings and RFC. At page 32 of the record, the ALJ employs the same boilerplate language criticized in *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012):

13

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(Tr. 32.) While the court will not overturn a credibility determination unless it is patently wrong, a remand is necessary where the credibility determination is based on evidence "cherry-picked from the record, selected without consideration of the context in which they appear." *Bates v. Colvin*, 736 F.3d 1093, 1098-1099 (7th Cir. 2013.)

Here, the ALJ never acknowledged that both state agency psychologists found Benedict to be credible, did not assign weight to Benedict's complaints, and selectively used testimony and evidence taken out of context. For example, the ALJ used a letter to discredit Held's testimony that Benedict was argumentative and had trouble interacting with authority figures because Lonnie McLernon, a manager who supervised Benedict for a month, said only that he had trouble exercising judgment and following more than simple instructions. (Tr. 28-29.) After explaining that Benedict was hired because his grandmother is the receptionist at Martin Group, McLernon wrote:

> Michael worked 56 hours for Martin Group, his start date was January 31st and his last day was February 28th. He was here at 8 am on the days we needed him and then worked for a few hours on those specified days. Michael performed well but I could definitely see that he has limitations. Michael was responsible for un-boxing the new equipment, removing all packing material, some assembly, taking out trash to dumpsters and he assisted on some of the installs to the clients location.
>
> My delivery Manager Jake was overseeing Michael. Jake informed me that Michael at times couldn't follow simply instructions, such as "don't attach the control panel" or "bring this copier to room 15." Michael ended up attaching the control panels and brought machines to wrong rooms. It seemed as if he was unable to retain the instructions he was given.

14

> Michael was only able to function normally for about 5hrs., anything over 5hrs., he would get anxious and his concentration level would weaken. The example I would use is a "caged bear." I made sure to keep his work shift under 5hrs after witnessing some issues. There was also a day where he was very agitated. He was only able to function for about 2hrs. His shift that day was only a 3hr shift. He approached me twice asking if he could go home. I told him very frankly "suck it up, you only have another hour to go." Just shortly after, he came to me again asking if he could leave. At this point because of his behavior, I excused him from work.
>
> Honestly, if this would have been an employee of mine, I would have reprimanded him with a write up or termination. Being in management, I believe Michael will have a very difficult time making it in the "real working world." During the hiring process, I look for responsible take charge, confident individuals. Employers don't want to hire people that need to be micro managed and hand held all day.
>
> In my professional opinion, Michael would need to find an employer that is willing to work with his limitations, and in this day and age, it will be very difficult to find that employer.

(Tr. 252-253.) While the ALJ did not misstate the letter, he selectively used the letter to discredit Held while finding that Benedict had the capacity for sustained full-time work, eight hours a day, five days a week, as required by SSR96-8p. Meanwhile, the McLernon letter states the opposite – his inability to sustain full-time work is why Benedict failed in his job. This is but one example of many where the ALJ cherry-picked the record.

The ALJ also gave Held's statements little weight because she has a "secondary gain interest in the claimant receiving disability monies as he is currently being supported by family members." However, there is no support for this statement in the record. Hence, the court declines to defer to "credibility determinations when, as here, the ALJ relies heavily on the kind of meaningless boilerplate and commits several analytical errors when assessing the record." See *Schmidt v. Colvin*, 545 Fed. Appx. 552, 555 (7th Cir.2013).

Because the ALJ's RFC and hypotheticals did not properly consider the limiting effects of Benedict's impairments as set forth in the state agency reports and failed to build the logical bridge from the evidence to the conclusion, a remand is appropriate. On remand, the ALJ is also directed to explain the weight given to Benedict's treating physician's December 14, 2010 report, as required by SSR 96-2p. Generally, a treating physician is entitled to controlling weight if it is consistent with the record, and in any event it cannot be rejected without a "sound explanation." *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011); *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). Here, the Commissioner acknowledges that the ALJ "could have better articulated what weight he assigned to the assessment." (Doc. 19 at 6.) Now, therefore,

IT IS ORDERED that the Commissioner's decision is reversed and the case remanded for further proceedings consistent with this decision pursuant to 42 U.S.C. § 405(g), sentence four.

Dated at Milwaukee, Wisconsin, this 25th day of September, 2014.

                              BY THE COURT

                              /s/ C.N. Clevert, Jr.
                              C.N. CLEVERT, JR.
                              U.S. DISTRICT JUDGE